## SAGORY, Receiver, &c. v. DUBOIS.

THE act *to authorize the business of banking*, passed in 1838, enabled any number of persons to associate and establish banks of discount, deposit and circulation, on the terms therein prescribed. The capital was not to be less than $100,000. The associates were to seal and file a certificate, specifying among other things, the amount of the capital stock, and the number of shares into which it was divided, and the names, residence and number of shares held by the associates respectively. The shareholders, unless by express stipulation in their articles, were not to be individually liable for the debts of the association.

A banking company was organized under this law, by articles of association, which declared that the capital stock should be a million of dollars, divided into ten thousand shares of $100 each, but business might be commenced, as soon as $100,000 were subscribed for and paid. If any shareholder should omit to pay any instalment on his shares, pursuant to any call of the directors, the articles provided that his shares should be forfeited to the use of the association, together with all previous payments made thereon. And the shareholders were not to be personally liable for the debts of the association. The original associates, of whom D. was one, signed four thousand eight hundred and thirty-five shares, on which over $100,000 was paid in, and the bank commenced business. All the associates signed a paper attached to the certificate or articles of association, by which they subscribed for and agreed to take the number of shares set opposite their respective names, as shareholders in the bank, and mutually bound themselves to fulfil all the engagements contained in the articles. D. subscribed for twenty-five shares.

*Held*, 1. That he was liable to pay the whole amount of the stock which he subscribed; 2. That the authority to forfeit the stock for the non-payment of called instalments, was a cumulative remedy, and did not affect the direct liability by force of the subscription.

The statute and his subscription, imposed upon him the duty of paying for his stock, which is recognized by the language of the articles of association, and from which the law implies an undertaking to make such payment.

The general banking law intended to provide for the payment, (or securing to be paid,) of an actual, substantial capital, to the extent defined in the articles of association, as the foundation of the operations of the banks thereby authorized.

This was the declared policy of the act, and it was imperatively demanded for the public security, in respect of the important privileges and franchises conferred on those associations.

The terms " subscribe for" and " agree to take," in instruments of subscription for shares in a bank or corporation, considered.

A banking association made several calls upon its stockholders for payment on their shares. It declared dividends on the stock paid in, and applied the same to meet some of such calls, the last of which dividends was unauthorized by the situation of the company, and was contrary to the general banking law. After

the calls on the shares amounted to half their nominal amount, the directors re-solved that no further calls should ever be made, and forthwith discontinued the business of the company, which soon after became insolvent, and on the application of a creditor, the court of chancery appointed a receiver of its property and effects. On a bill filed by the receiver, to compel a stockholder to pay the balance of the nominal amount of his shares ;

*Held,* 1. That the defendant, having become liable by his subscription to pay up his shares in full, as called for by the directors, might be compelled to pay the same by the receiver who represents the creditors of the company, although there was no resolution of the directors *requiring such payment.*

2. The resolution that no further calls should be made, was void as to the receiver.

3. The unauthorized dividend was not a valid payment upon the defendant's shares, and the amount of the same still remained due and payable.

4. The receiver was authorized to proceed in equity, to compel the payment of the balance due on the shares.

5. The other shareholders were not necessary parties to the suit.

6. The defendant cannot in such suit, question the regularity or propriety of the receiver's appointment.

7. The receiver is entitled to recover interest, from the date fixed by him in his advertisement, for the payment of demands due to the company.

   Nov. 7, 8 ; Dec. 3 and 5, 1845 ; March 27, 1846.

THE bill in this cause was filed, October 1, 1844, by Charles Sagory, as receiver of The New York Banking Company, against Cornelius Dubois, Jr., a stockholder in the company, to compel him to pay up the unpaid balance on the shares of capital stock owned by him. The facts established by the pleadings and proofs, were as follows :

The defendant, with John Delafield and six others, on the tenth of October, 1838, formed an association under the *Act to authorize the business of banking,* passed April 18th, 1838, which was called The New York Banking Company. Articles of Association, pursuant to the act, were drawn up and signed and sealed by the eight associates, which were recorded in the clerk's office of the city and county of New York, and filed in the office of the secretary of state, on the 3d of November, 1838. By those Articles, the bank was located in the city of New York, its capital was declared to be one million of dollars, divided into ten thousand shares of one hundred dollars each ; and provision was made for increasing the capital to twenty millions of dollars. Seven directors were named in the Articles, of whom the defendant was one. They were to hold their offices for the term

of six years, and were to have the entire government and management of the property and affairs of the association. If any shareholder omitted to pay the instalments on his stock, as called for by the board of directors, his shares should be forfeited to the use of the association. The association was to commence business, as soon as one hundred thousand dollars of its capital stock should be subscribed for and paid. By the twelfth article, no shareholder of the association, was to be liable in his individual capacity, for any contract, debt, engagement or transaction of the association, or any of its officers or agents.

To the Articles of Association, there was annexed a subscription or agreement, which was signed by the respective associates, together with their residences, and the number of shares of the capital stock taken by each. The agreement was in these words:

" We, the undersigned, do hereby subscribe for and agree to take the number of shares set opposite to our respective names, as shareholders of The New York Banking Company, having paid an instalment on the same, at the time of subscribing, of five dollars on each share, and we do bind ourselves and assigns to fulfil all the covenants and engagements contained in the articles of association, dated the tenth day of October, one thousand eight hundred and thirty-eight."

"NEW YORK. | Cornelius Dubois, Jr., twenty-five shares. | 25."

This paper was executed by the defendant in the manner appearing above, and by the other associates in a similar manner; the whole number of shares subscribed, being 4835. The agreement was recorded and filed with the Articles of Association.

The requisite amount, $100,000, was paid in by shareholders in the winter after the organization of the company, and it proceeded to open an office of discount, deposit and circulation, and transacted the business of banking, in the city of New York. On the 8th of January, 1839, Mr. Delafield was elected president of the company. On the 23d of January, 1839, the directors made a call of five dollars on a share, payable on the 4th of February then next; and they resolved that shareholders should be permitted to make advances upon their unpaid stock, and to

pay up the same in full, at their option. Six other instalments were called for by the board, payable at different periods, up to November 8th, 1840, amounting in the aggregate, with the previous call and the sum paid on subscribing, to fifty per cent. of the nominal amount of the stock subscribed. Three dividends on the capital paid in, were declared, payable cotemporarily with the sixth, seventh and eighth instalments, viz.: one of four per cent., payable October 15, 1839; one of three and one-half per cent., payable April 20, 1840; and one of the like amount, payable November 1, 1840; each of which dividends were credited as payments on the calls then made payable. Previous to July, 1839, there had been subscribed by several persons, 2828 shares of the capital stock, in addition to those originally taken; and on the first day of July, 1839, the directors by a resolution, allotted to their assistant cashier, N. Dyett, in trust for the association, the balance of the stock not subscribed for, and he accordingly subscribed as trustee for such balance, being 2337 shares. No payment was ever made on account of this stock. In respect of the stock subscribed by the associates and others, 1983 shares were paid up, so as to become full stock, and on other shares the calls were paid as they fell due, the dividends being applied as before stated. On many other shares, but few of the calls were paid, and on some no payments were ever made. Mr. Dubois paid all the calls on his shares, so that, including the dividends, he had paid half the nominal amount of his subscription.

From July to November, 1839, the company became indebted to Edward Boisgerard in the sum of $150,000, of which the greater portion remains unpaid; and in November and December, 1839, the company became indebted to The Farmers Loan and Trust Company, in several thousand dollars, which debt is still due. In connection with the advances made by Boisgerard to the company, it entered into a contract to the amount of several hundred thousand dollars, with the Hernando Rail Road and Banking Company, of the state of Mississippi, and advanced large sums to the latter. The Hernando Company failed to perform its engagements, and ultimately became insolvent, being the debtor of the New York Banking Company, to more than one hundred thousand dollars. This and other losses, compelled

the latter to suspend its banking business; which was done by a resolution on the 14th of September, 1841; and reduced it to an insolvent condition. The Hernando Company's first default, occurred in the fall of 1839, and was known to the president in or before December of that year. Its full delinquency, was known and reported to the board of directors, before the dividend was declared in April, 1840; and before the dividend payable November 1, 1840, was declared, it was apparent from the state of the affairs of the New York Banking Company, that it had no profits to divide, and was threatened with the loss of a considerable part of its capital. The defendant was an active director, attending nearly all the meetings of the board; but the affairs of the company were managed by the president almost exclusively.

The company in January, 1842, neglected to make out and transmit to the bank commissioners, and to file in the secretary's office, the statement of its affairs, required by the act of May 26, 1841, to amend the act entitled an act to authorize the business of banking. On the 1st day of March, 1842, Boisgerard filed a bill before the Vice-Chancellor, against Delafield, president of the New York Banking Company, setting forth the indebtedness of the company to him, its insolvency, and its omission to comply with the last mentioned statute, and praying for an injunction against the company's further disposal of its effects, and the appointment of a receiver, and that the assets of the company might be applied to the payment of its debts. An order for an injunction and receiver, was made in that suit by the Vice-Chancellor, on the 28th of April, 1842, and a receiver was appointed, who died in June, 1843. In July, 1843, the complainant was duly appointed receiver of the effects of the New York Banking Company, pursuant to the foregoing order and one subsequently made in Boisgerard's suit by the Vice-Chancellor. A formal transfer of all the property of the company, was made to him as receiver, on the 22d of September, 1843.

The Farmers Loan and Trust Company recovered a judgment against the New York Banking Company, in January, 1843, on which an execution was issued and returned unsatisfied; and on the 18th of August, 1843, on the petition of the former com-

pany, setting forth those facts, the Chancellor made an order for an injunction against the New York Banking Company, pursuant to the revised statutes, and appointing the complainant receiver of its property and effects.

The complainant, as receiver, pursuant to the statute, advertised for all persons indebted to the company, to pay the same by the 15th of January, 1844.

On the 14th of June, 1844, a final decree was made by the Assistant Vice-Chancellor, in Boisgerard's suit against the company, (see the report of the case in 2 Sand. Ch. R. 23 ;) by which he was declared to be a creditor of the company, that the company was insolvent, and in other respects was liable to be proceeded against for a dissolution, and by which the company was dissolved except as to the collection of its demands, and the receiver was directed to distribute its assets among its creditors. Under this decree, a master of the court reported that there was $85,434 63, due from the company to Boisgerard. The decree in that suit was enrolled; the company nevertheless took an appeal from it to the chancellor, which was pending when this suit was heard.

The bill averred, that in order to pay the debts of the company, it would require the solvent stockholders to pay the full amount of the unpaid balance on their shares, and insisted that the stockholders were liable to make such payment. It was proved that the assets of the company were utterly insufficient to pay the debts. On the other hand, it appeared that the board of directors, on the 14th of September, 1841, passed a resolution, that from and after that date, no instalment beyond the fifty per cent. then paid in, should be called for on the capital stock of the company. And the defendant in his answer, insisted not only that this resolution was valid, and exonerated him from further payment on his stock ; but also that his subscription to the capital stock, never made him personally liable to pay any sum thereon, unless he elected to do so ; and the only remedy against him for non-payment of calls regularly made, was the forfeiture of his shares.

His answer set up various grounds of defence, preliminary to the question of his liability, which are adverted to in the opinion

of the court : That the statements of the affairs of the company, exhibited to the directors by the officers, at the time of the declaring the respective dividends, showed that the company then had surplus profits beyond the amount of such dividends, and that the defendant believed those statements to be correct, and acted in entire good faith, in assenting to the dividends : And he insisted that the dividends were in fact warranted by the situation of the company, and that the company never was so far insolvent, as to be unable ultimately to pay its debts. The answer also insisted that the act of May 26, 1841, was not binding upon the company ; that all the shareholders were necessary parties to the suit, and that the complainant had an ample remedy at law.

*C. B. Moore*, for the complainant.

I. By the 27th section of the general banking law of 1838, and the 1st, 2d, and 3d sections of the amended law of 1841, (see Laws of 1841, p. 357, 360,) any association neglecting to make out and transmit the statement required by the act, or violating any of its provisions, might be proceeded against and dissolved, in the same manner as any moneyed corporation.

II. The associations organized under the act, are substantially to be regarded as corporations, and all remedies applicable to corporations, at least in proceedings to enforce civil remedies against them, should be applied to these associations. (See 3 Hill, R. 319, 389, and cases cited.) This was decided by the vice-chancellor, the assistant vice-chancellor, and by the chancellor, (on appeal from the order appointing receiver,) in Boisgerard's suit.

III. The complainant has been appointed receiver, with all the powers of receivers of corporations, not only at the suit of Boisgerard, under the 38th and 39th sections of the Rev. Statutes, (2 R. S. 220 2 Ed. p. 378, 379,) upon proof that the New York Banking Company had not made the statement required by the general banking law, and had violated the provisions of that law ; but also at the suit of the Farmers Loan and Trust Company, under the 36 and 37th sections of the Revised Statutes, (2 R. S.

378.) The complainant had all the powers defined in the 42d section, (2 R. S. 379,) by which it is his duty "if there shall be any sum remaining due upon any share of stock subscribed, to proceed and recover the same," and for that purpose to file his bill, &c.

IV. In both these forms of proceeding, the complainant is to divide the property collected by him, among the fair and honest creditors of the association. (See 2 R. S. 378, § 37; 380 § 48; 385, § 79, 80, 82.) He is to pass upon the validity of debts and claims against the association, (2 R. S. 384, § 72, 73, 74; 1 R. S. 799, sub. 8 of § 7, p. 108, § 19.) His proceedings are subject to the direction of the court, but no debtor nor stockholder sued for arrears, can bring into such suit, enquiries about the validity of particular debts or claims against the association. *Mann v. Pentz*, before Assistant Vice-Chancellor.

V. The defendant is responsible under these proceedings, for the balance remaining unpaid upon his subscription of stock.

(*a*) The agreement to take the shares, is an agreement to pay for them and the law contemplates the actual payment in full of the shares first subscribed.

(*b*) The provision for a forfeiture of shares, is merely a cumulative remedy. (21 Wendell, 273; 2 Hill, 127.)

VI. The resolution of the directors, the defendant being one of them, passed after the debts had been incurred, not to call for more payments of stock, was wholly nugatory. The defendant was present and aided on that occasion. Without him there would not have been a quorum of the board.

VII. The objection that the association is not a corporation, nor subject to the laws respecting corporations, while it is admitted to have acted under the general banking law; is untenable. The same relief ought to be given, even if the general regulations respecting corporations are not obligatory.

VIII. The Boisgerard claim, established in a suit against the president of the association, (which course the act authorizes;) is not to be tried again in this suit. But the defendant has not succeeded in impeaching the validity of the claim, even if it could be enquired into in this proceeding. There are also various other

debts, which of themselves call for the payment of the defendants stock

IX. The claim against the defendant, limited to the amount of stock subscribed by him, should be paid in full, as an asset of the ban kfor the payment of its debts; without waiting for the slow collection of other assets. *Mann* v. *Pentz*, decides this point.

X. The appeal alleged, is imperfectly proved, but if proved, was no stay of proceedings, and forms no excuse for a delay on the part of the complainant; much less a ground of defence.

XI. There would have been no propriety in joining other stock-holders in this suit. The objection of a non-joinder is untenable.

XII. The defendant by his acts, is estopped from setting up that he is a mere partner. The objection of an adequate remedy at law is untenable.

XIII. The defendant must deduct the amount of the alleged dividends, from the amount of his alleged payments, or account for the dividends as capital improperly withdrawn.

(*a*) It was improper to make dividends before the stock was full. An omission to fill up and pay in capital subscribed, must be treated as a withdrawal of capital, under the 28th section of the act of 1838.

(*b*) The defendant having been himself a director, and his presence necessary to constitute even a quorum of four; he cannot set up due diligence in defence of a dividend actually unwarranted.

(*c*) One dividend at least was irregularly declared.

(*d*) The whole were improvident, and their obvious connection with the calls of stock, and the attending circumstances, show that they were not made with that entire good faith which *is indispensable to sustain them. They were based on anticipated profits, and on discounts credited to profit and loss before they were earned.*

XIV. There should be a decree that the defendant is liable to pay the amount of his subscription, with interest from the 15th of January, 1844, and costs; and a reference to a master to compute the amount due, giving credit for the actual payments in pursuance of the calls, less. he amounts of the dividends.

*E. S. Van Winkle,* for the defendant.

I. The liability of the defendant (if any) in this suit, must grow out of the articles of association, or the subscription for stock, or both. There is no common law liability. He came in under the act of 1838, supposing that he was to be subjected to its provisions only, relying on that hypothesis. The sections of that act, from the 15th to the 17th, the 22d and the 23d, and the 25th to the 28th, show that no such liability as that claimed in this suit, was ever contemplated. The history of the times when it was enacted, may be referred to, if the statute itself does not show its own exposition. (3 Howard's U. S. Rep. 1.) Its history will show that the legislature never intended that these associations should be considered as corporations, but as large partnerships.

II. By the subscription, the defendant subscribed for and agreed to take twenty-five shares, and bound himself and assigns, to fulfil all the covenants and engagements contained in the articles of association. He did take such number of shares, according to the true intent, and meaning of the articles, and has fulfilled all the covenants and engagements therein contained. He paid all the calls that were made on his stock, and the board of directors in whom the control was vested, adopted a valid resolution that no further calls should be made.

III. The articles provide in sect. 2, that the shares shall be $100, each; and in article 6, that in case "any shareholders shall omit to make payment pursuant to any call of the directors for any instalment or instalments due on the stock standing in the name of such shareholder, or omit to fulfil any of the covenants or agreements of this contract, the shares held by such stockholder shall be forfeited to the use of the association, together with all previous payments made thereon." That is the only penalty and remedy provided, or that was in the contemplation of the parties.

IV. The articles further provided in article 12, that no shareholder of this association shall be liable in his individual capacity, for any contract, debt, engagement or transaction of this association, or any of its officers. The act of the legislature commonly called the "Free Banking Law," under which this association was organized, contains a similar provision in its 23d sec-

tion. (Laws of 1838, p. 245.) This bill therefore, seeking to render this defendant liable in his individual capacity, for the debts and engagements of the company, cannot be sustained.

There is a great distinction between corporations and these associations. Every creditor of the latter, by the articles of association filed and recorded, has notice in law, of all the conditions under which they exist. It is thus like a limited partnership. (10 Paige, 261.) Dealers with the association therefore, are not deceived. Our agreement was to pay all such instalments as should be called for, and if we did not, to forfeit our shares and the previous payments. Any stockholder had a right to stop, on forfeiting what he had paid.

This is a new act, introducing a new system, and intending to effect a change. The act itself declared there should be no personal liability ; yet this suit is brought to charge the defendant with the debts of the association. Our agreement is expressed in the act, and the articles, which are to be taken together, and was upon the condition that we might forfeit, if we chose. (Angell and Ames on Corp. 419, 420, 428.) In the cases under the general manufacturing law, and kindred acts, there was something more than is contained in this agreement. In some, notes were given ; in others, an express promise to pay, as in 21 Wend. 296, one of the most recent.

V. This is not a question whether there is a cumulative remedy by suit, on the articles of agreement, in addition to a forfeiture of the stock, but a case in which there has not been any forfeiture incurred, and no agreement to pay beyond the call for instalments. The defendant has paid all those calls, and that is all he pledged himself to do. The general laws of the state are not applicable. If they are, § 23 of the banking law was unnecessary.

VI. The New York Banking Company was an association formed under and in sole reference to the act entitled " an act to authorize the business of Banking," passed the 18th day of April, 1838 ; and the same was regulated and to be governed by the provisions of that act, and the acts amendatory thereof, and was not subject to or to be governed by the general laws of the state in regard to corporations, or moneyed corporations ; or to

any other statutes of this state, except such as were therein mentioned and referred to. (See articles of association.)

All decisions of our courts declaring these associations to be subject to the rules and liabilities of moneyed corporations under the Revised Statutes, are adverse to the laws of this state. (1 Hill, 616; 25 Wend. 472; 1 Rev. St. 602, § 11, 25, 26; 2 R. S. 462, § 33, 34; Act of May 14, 1840, § 11.)

VII. But if the association is a corporation, within the meaning of the constitution of this state; and as such subject to the general laws of this state relative to corporations or moneyed corporations; then the complainant cannot maintain this suit, because the act of April 18, 1838, was not passed by the assent of two thirds of the members elected to each branch of the legislature which passed the same, and is consequently unconstitutional and void. If the court has any doubt whether an act was so passed by two thirds, it must inspect the record.

VIII. If the law then be unconstitutional and void, the defendant is not bound to make good his subscription. Boisgerard has no claim on the defendant as a sole party: the only responsibility of the defendant, (if any,) is a joint one with his associates, and this bill must be dismissed for want of proper parties. The contract of Boisgerard with John Delafield, cannot be enforced against the defendant. The defendant is only liable (if at all,) as a partner and associate, and the full stockholders are equally liable as well as defendant. The receivership is a nullity and illegality.

IX. Boisgerard, under whose bill the receiver was appointed, had no legal claim against the company.

X. The decree obtained by Boisgerard against John Delafield president of the New York Banking Company, and by the Farmers Loan and Trust Company, are not in any way or to any extent binding or obligatory upon the defendant, as determining either the existence or extent of any claim of Boisgerard, or the Farmers Loan Company upon the association; but this defendant is at liberty to contest the same. He never in person or by delegation, has had any opportunity to contest those claims. (2 Paige, 451.)

XI. If such decrees or either are binding and obligatory on the

New York Banking Company as an association, and upon all the rights of this defendant as a stockholder, therein, so as to deprive him of all right to contest those claimants right to be paid out of the assets of the company; yet they are to no greater extent binding on this defendant, especially when the complainant seeks thereunder to render this defendant individually liable and to contribute to debts not claimed by those creditors in their suits except as against the association, and in respect to which claims so made, this defendant has never had an opportunity of being heard, or of producing his proofs, or of having a trial by jury. The act allowing suits in chancery on these liabilities, is unconstitutional in denying that right. (Const. Art. 7, § 2, 7.) Here our property is sought to be taken without due process of law. (Const. of U. S., Amendments.)

XII. But if the defendant is not allowed in this suit, to dispute the claim of Boisgerard against the New York Banking Company, on the ground that it is *res adjudicata*, and cannot question the right of complainant to act as receiver, on the same ground, and is liable to respond for an amount, sufficient to make his shares full stock, in a suit against him personally, and that by virtue of his agreement to take twenty-five shares of stock; then the complainant's bill must be dismissed, as he has a full remedy at law against the defendant. (2 R. S. 469, § 69.) The statute means to give a remedy in equity, when there is none at law; not to subvert the established principle, that legal actions are to be pursued at law.

XIII. Even if the defendant is liable in any way or to any extent, or to any person whatever, for any deficiency on the shares subscribed for by him, in order to make them full shares, it is not competent for the complainant, as such alleged receiver or otherwise, to enforce such liability; and that the complainant in and by his bill has not stated such a case as authorizes him to file the same, or entitles him to the aid and interposition of this court. The complainant should at least have had the authority or direction of this court, to file the bill. (2 R. S. 461, § 33 to 35, 43 to 49.)

XIV. The scope and object of the bill of complaint in this cause, render it incompetent for the complainant to exhibit his

bill against this defendant singly; but all the stockholders or alleged stockholders should and ought to be united together as defendants in one bill of complaint, to the end that the responsibility, (if any,) might be apportioned among, and a just and equitable contribution enforced between them; which cannot be done when separate suits are brought against each stockholder. This proceeding leads to circuity of action, and a series of bills to enforce contribution against other parties. The general rule of equity is against such a course.

*C. O'Conor*, for the defendant.

First. The preliminary point, as to the jurisdiction of the court. (The counsel referred to 2 R. S. 469, § 67 to 69; the usury act of 1837, Laws of 1837, p. 487, and the decisions under it in 3 Edw. Ch. R. 444, and 7 Paige, 602; the act giving a remedy to remaindermen &c., and cases under it, 1 Rev. Laws, 527, § 33, 11 Johns. 429, and 13 Johns. 263; also to 2 R. S. 464 § 44 to 50, and 20 Johns. 669.)

Second. Did the defendant bind himself to pay up these shares of stock? The leading case, and the one on which the complainant relies, is *The Hartford and New Haven R. R. Co.* v. *Kennedy*, (12 Conn. R. 499.) Angell and Ames give the doctrine that a subscription to stock, where the party, expressly in terms, or by fair and necessary implication, agrees to take the whole amount of the stock and to pay for it; is binding and may be enforced. But where it is neither express, nor fairly to be implied, then no recovery can be had against him, and he is at liberty to renounce or abandon the undertaking, whenever he sees fit. The question generally arises when there is a provision for a forfeiture. This furnishes a cumulative remedy, whenever there is a promise to pay either express or implied; but when there is neither, it constitutes a term of the contract, on which he may renounce the undertaking.

In the case in 12 Conn., Huntington, Justice, examines the question in a very elaborate opinion, one of exceeding, nay, amazing ability; and he holds that the only difference is between an express and implied promise. There was really no difficulty in the *R. R. Co.* v. *Kennedy*. The thirteenth section of the R. R.

charter, provided that the corporation *might require payment* of its stockholders. Here there is no mode of inferring a promise to pay, except from the clause of forfeiture itself. The strongest words in this subscription are, " agree to take the number of shares." If there had been no clause of forfeiture, perhaps the agreement to pay might have been implied. Now, the sixth Article, which is the only remaining ground, contains no power to the directors to make calls, or expressly requiring payment. It contains the remedy of exclusion, referring to the omission to pay, but there is no obligation attached. Thus it is brought within the distinction taken in the 12 Conn. R. In the next case, decided in 12 Conn. R. 530, the same corporation v. *Boorman*, it was held that the defendant by accepting an assignment of the shares, became a stockholder, and thus liable. In all the adjudged cases, there has been either an express promise, or a direct legal liability to pay.

Judge Huntington in the case of Kennedy, relied on the following authorities : 1 Caines, 380, in which there was an express promise to pay ; 14 Wend. 20, where by the charter, shareholders were made liable for the debts of the company ; 2 Greenleaf, 404, and 576, in one of which the statute declared the party should pay, and in the other that the shares should be paid as called in ; 6 Harr. & Johns. 394, and 1 Halsted, 365, which were suits to recover assessments authorized by law to be imposed and collected ; and 6 Harr. & J. 128, where the original stockholders were liable, and the defendant, an assignee, assumed the liability.

The cases cited by the counsel in 12 Conn., are no better, to sustain the complainant. In 5 Mass. 83, there was an express promise in writing; and so in 9 Johns. 217, and 14 Johns. 239. One of the cases cited, refers to 16 Mass. 102, where the corporation failed to recover assessments, but did recover on an express promise.

As to 21 Wend. 274, the Herkimer Manufacturing Co. case, there was an express promise, and the charter also imposed a liability ; and 21 Wend. 296, the case of the Troy Turnpike Co., there was a positive agreement to pay, on pain of forfeiture of the shares. The latter is always regarded as a penalty, and the agreement to pay is therefore held binding, and the forfeiture

Sagory v. Dubois.

does not take away any right or remedy.  The Troy Turnpike case is thus directly in favor of the rule for which we contend, and accords with the principle of the Massachusetts decisions and with the treatise of Angell and Ames.  ·

It will be said, that although there is no act of incorporation, the Articles of Association are equivalent.  This is correct under the decisions, and the Act of 1838, must itself apply, permitting the Articles to regulate as to the amount of the capital stock to which the association was limited, and the amount which must be paid, and the like.  There is no clause in the act other than this permissive section, to eke out an implied promise to pay; and there is none in any other statute.  Now here, the Articles declare that the capital stock *shall be* $100,000, and *may be* a million.  If it be said, that section 69 of 2 R. S. 469, applies, I answer, it gives no new right of action.  It merely confers a remedy, where a right already existed.  The statutes relative to corporations generally, or to insolvent corporations, do not apply to these associations, unless where such statutes are referred to in the general banking law or the amendatory acts.  The legislature, (as it has been decided,) by that law created *corporations*, but required that they should be known as *associations*, and not as that thing which in general legislation was called a corporation.  So in the amendatory acts, the legislature contra-distinguished corporations from these associations, and thus they show that the provisions of law applying to the former are not to apply to the latter.  The legislature has the power to declare how its language shall be understood, and in effect enacted that the laws relative to corporations should not apply to these associations, although they are in fact bodies corporate ; that they are not to be deemed corporations in the legislative sense.  Thus laws have twice been enacted, prescribing the forms of the returns to be filed by the banking associations; although the existing laws relative to chartered banks prescribed those forms.  And various provisions relative to monied incorporations, have by statute been made expressly applicable to these associations.  *Expressio unius est exclusio alterius.*  (See Laws of 1839, p. 328; 1840, p. 154; 1841, p. 33, 106, 168, 308.)  Therefore we must look to the common·law, the general banking law, and the articles of

association, for the liability of the shareholders; and not to the revised statutes, or any other source. And referring to those standards, the defendant in this case had the right to go on and pay, or to withdraw from the company, and forfeit what he had paid.

*F. B. Cutting*, in reply.

FIRST. As to the complainant's right to institute this suit. (The counsel referred to § 27 of the general banking law; 2 R. S. 463, §§ 39, 41, 42, and § 67 to 69; 2 R. S. 42; *Mann* v. *Pentz*, before the Assist. Vice-Ch.; 9 Paige, 160; and 7 Term Rep. 37.)

SECOND. Is the defendant liable for the balance of the twenty-five shares which he subscribed? The terms of the subscription, with the articles of association and the banking law itself, import a promise to pay the shares.

The object of the banking law, was to create institutions for loaning money, and of course with monied capitals. The certificates were to be filed, in order to show the amount of such capital, and the responsibility of those who were to pay.

Those who took shares by transfer, were to " succeed to all the liabilities of prior shareholders." (§ 19.) What were those liabilities? There was to be no personal individual liability to creditors. There was nothing upon which the clause could operate, except the payment for shares subscribed. The provisions as to dividends and new subscriptions, point to the same conclusion. The subscription was not a nominal act. The object of the associates, *inter sese*, was to raise the proposed capital, by a subscription or a sale of shares. They engaged that the capital should be a million, and each so engaged to the extent of the shares he subscribed. Each undertook that such shares should go to make up the requisite amount. The sixth article shows it was their intention that the stock signed, should be "*paid in.*" The "par value" is referred to; that is, the sum contributed in that mode. So when the language is used, "until subscribed and paid for, or secured to be paid," &c. If it be said that this is limited to the nineteen millions of capital beyond the first million; I answer, if it were so designed, the intention would have been expressed. The first million is included in the twenty.

So the provision to forfeit for neglect of payment, implies a duty to pay. There can be no neglect, unless there be a duty. So as to the clause, when an instalment becomes due, &c.; it is not *due*, unless the party is bound to pay it. Like a paper signed, which says "Due A. B.," &c., or "I. O. U.;" the law enforces each as a promise. The leading case referred to, 12 Conn. at p. 509, shows that no precise words are necessary to make such a promise.

Now the paper itself, which the defendant signed. He *agreed* to take, and he *did* take, twenty-five shares; and the question is, whether he can *take* the shares and not *pay* for them. He took the shares and the dividends. I agree to take your house for a year, and go into possession. Can I at the end of the year, set up that there was no agreement to pay rent? So I go into a shop and say, I will take certain goods. To "*subscribe for*," is to promise a stipulated sum for the promotion of a specified undertaking. (Johns. & Walk. Dict.) So the word "take," means to receive, to accept, to purchase. Here it imports paying up the stock. Suppose a subscription for a book to be published in twenty volumes. I subscribe, saying I will *take* the work, and after receiving one volume, refuse the rest. So of an enterprise to build a steamship, or the like.

Any other interpretation of this subscription, would be a fraud upon creditors; especially after filing the articles of association. The cotemporary exposition of the subscription by the defendant and the other parties, corresponds with this construction. The directors made *calls* for payments, which it is now said they had no right to enforce. So they finally resolved that no more calls should be made; and mean time, allowed stockholders to pay in advance of the calls.

They agreed that the capital *should be* a real capital of a million. An engagement to pay for shares received, to the extent of $100 a share, whenever required by the directors, is equivalent to a purchase of the shares. If the defendant had only put his name to an instrument, saying "I become a member of a company," expressing its capital, &c., he would have been liable to pay. (1 R. L. 600, § 5; 3 Rev. Stat. 531, 2d ed.)

In 2 Beav. 560, the Herkimer Manufacturing Co. 21 Wend.

273, and the Troy Turnpike Co., 21 Wend. 296; there was nothing stronger than there is in our case; and the parties were held liable.

There is no such distinction, as is urged on the other side, between *allowing the corporation to forfeit*, and providing that the shareholders shall pay " *on pain of forfeiture*."

*The Hartford and New Haven R. R. Co.* v. *Kennedy*, (12 Conn. 499,) is directly in point. It is a very able and elaborate case, and the court there examines the Massachusetts decisions, which are the only authorities that ever threw any doubt on the question. In 12 Conn. 530, the same decision was made against an assignee. Similar authorities, are 6 Harr. & Johns. 128; 2 Greenleaf, 404; 2 Bibb. 576; 7 T. R. 36, before cited; 2 Price's R. 93; and 14 Johns. 238. In the latter, there was an express promise. In 10 Johns. 217, the defendant, sued on a church subscription, was held not liable, there being nothing from which to infer a promise. In 14 Wend. 20, the doctrine was taken for granted by the court. That the authority to forfeit and sell the stock for non-payment, was merely cumulative, I refer to 9 Johns. 217; 21 Wend. 273, and 296, before cited; 2 Hill, 127, and 12 Conn. 529, and the authorities there cited.

As to the resolution of September, 1841, against making more calls on the stock, which the defendant denominates a release; it is a release executed by the debtors themselves, in their own favor. It is sufficient to refer to *Nathan* v. *Whitlock*, (9 Paige, 152,) to show its invalidity.

THIRD. The defendant is bound to restore the dividends credited to him, or to pay the instalments on his shares which were thereby discharged. Those dividends were so much capital withdrawn from the company, and the burthen is on the defendant to show they were rightfully paid. 6 Paige, 486; 7 Paige, 201. (The counsel here commented upon the testimony relative to these dividends, and their impropriety and improvidence.) Until the stock was paid in full, defendant had no *shares*, properly speaking, and could not receive dividends. It is clear the intent was to contrive a mode to fill up the stock, without paying any thing. They had no right to divide probable earnings, nor any thing not actually earned. If the dividends were the result

of error as to facts, and not of carelessness or fraud, still the defendant must refund them, with interest from the date of each.

The receiver is entitled to recover interest on the whole unpaid balance, and the latest period to which he can be limited, is the date specified in his notice to the debtors of the company. That notice was equivalent to a call by the directors.

THE ASSISTANT VICE-CHANCELLOR.—Several of the points presented on the part of the defendant, have been settled by various adjudications in our courts of law and equity. Thus, it is decided in the court of last resort, that the act to authorize the business of banking, usually called the *General Banking Law*, is constitutional, although on its passage it did not receive the assent of two-thirds of the members elected to each branch of the legislature. ( *Warner* v. *N. A. Trust and Banking Co.*, 23 Wend. 103; *Farmers Bank of Hudson* v. *Livingston*, Dec. Term, 1845, not yet reported.(a)

It has also been decided in the same court, in the supreme court, and by the chancellor, as well as by the assistant vice-chancellor, that the associations organized in pursuance of the act, are *corporations*, and as such are liable to the provisions of law in respect of monied corporations, except where such provisions are inconsistent with the special legislation relative to these associations. Indeed this proposition was decided in the suit of *Boisgerard* v. *The New York Banking Company*, in which the complainant was appointed receiver, in both branches of this court in the first circuit, and by the chancellor on appeal from the order for a receiver.

That order, and the final decree in the suit of Boisgerard, decide two other questions, viz.: that Boisgerard was a creditor of the N. Y. Banking Company; and that the association had subjected itself to the proceeding which resulted in the appointment of a receiver. These are questions which are not open to inquiry in a suit against the defendant as a stockholder of the association.

(a) Now reported, 2 Denio, 380.

All these points were presented, for ulterior purposes, and it is sufficient to notice them thus briefly.

The right of the receiver to bring this suit, under the provisions of the revised statutes relative to Proceedings against Corporations in Equity, is adjudged, so far as I am concerned, in the case of *Mann, Receiver of the Catskill and Canajoharie R. R. Co.* v. *Pentz*, January 6, 1845, not yet reported ;(a) in which case, I gave the subject a thorough consideration.

The same decision overrules the objection that the receiver's remedy to compel stockholders to fill up their stock, is at law and not in equity.

In this case no action at law could be maintained, for the reason that no calls had been made for the unpaid amount of stock.

As to the remedy being at law for legal causes of action, and in equity only when there is no legal remedy ; it may be answered, that the statute gives a new remedy for a new state of things, and expressly declares it may be pursued at law or in chancery.

It was said that the act was unconstitutional, as depriving the party sued in equity of the benefit of a jury trial. Without entering at large upon so grave a question, I think this defendant is not at liberty to urge such an objection. The legislature created new rights and privileges, and new remedies in respect of such rights, and the defendant voluntarily subjected himself to both. He cannot accept the franchises conferred, and repudiate the terms and conditions with which the legislature accompanied them.

It was also objected, that the receiver should have brought into the suit all the stockholders of the association, so that the court could enforce contribution as should be just.

The statute provides otherwise, in the 69th section of the title before mentioned. (2 R. S. 469, § 69.) A joint suit, in order to carry out the idea of contributions, would require all the claims against the corporation and all its assets to be adjusted, and

---

(a) See this case in 2 Sand. Ch. R. 257.

would, I apprehend, prove to be a very slow process for cred-itors.

These are all the formal or preliminary points, which it is necessary to notice, and I now come to the interesting question in the cause ; is the defendant liable by reason of his subscrip-tion to the capital stock of this association, to pay to the receiver, the amount remaining unpaid on such stock, so as to make the same full stock ?

The act to authorize the business of banking, (Laws of 1838, chapt. 260,) enabled any number of persons to associate and establish banks, and expressly conferred on the institutions or-ganized under it, subject to the prescribed limitations, all the powers usually exercised by the banks previously incorporated in this state. They were authorized to discount bills, notes, and evidences of debt ; to receive deposites ; to issue bank notes for circulation ; to buy and sell bullion, coin, and bills of exchange ; to loan money on real and personal security, and to exercise all incidental powers necessary to carry on such business.

The 15th section of the act provided, that the aggregate amount of the capital stock of any such association, should not be less than $100,000.

By the 16th section, the associates were required to make a certificate under their hands and seals, which should specify : " 1. The name assumed to distinguish such association, and to be used in its dealings. 2. The place where the operations of discount and deposit of such association are to be carried on, designating the particular city, town or village. 3. The amount of the capital stock of such association, and the number of shares into which the same shall be divided. 4. The names and places of residence of the shareholders, and the number of shares held by each of them respectively. 5. The period at which such association shall commence and terminate." This certificate, was to be duly acknowledged or proved, and recorded in the clerk's office of the county where the association should be established, and a copy was to be filed in the office of the secretary of state.

The 19th section made the shares transferable, and imposed upon all who became shareholders by a transfer, the rights and liabilities of the prior holder of such shares. And no change

should be made in the Articles of Association by which the rights, remedies, or security of existing creditors, should be weakened or impaired.

By the 20th section, every association by its original articles, might provide for an increase of its capital from time to time.

By section 26th, each association was required on the first Mondays of January and July in every year, to make and transmit to the comptroller, a statement upon oath, containing amongst other things,

" 1. The amount of the capital stock paid in according to the provisions of this act, or secured to be paid."

" 8. The amount of the losses of the association ; specifying whether charged on its capital or profits, since its last preceding statement, and of its dividends declared and made during the same period."

" 11. The amount which the capital of the said association has been increased during the preceding six months, if there shall have been any increase of the said capital," &c.

By the 28th section, " If any portion of the original capital of such association shall be withdrawn for any purpose whatsoever, whilst any debts of the association remain unsatisfied, no dividends or profits on the shares of the capital stock of the association, shall thereafter be made, until the deficit of capital shall have been made good, either by subscription of the shareholders, or out of the subsequently accruing profits of the association," &c.

The Articles of Association of The New York Banking Company, provide that the capital stock of the association shall be one million of dollars, divided into ten thousand shares of $100 each, and may be increased to twenty millions of dollars.  By the sixth article, this increase might be made by the board of directors from time to time, either by subscription, or by a sale of the shares, until the twenty millions should be subscribed and paid for, or secured to be paid, as the directors might require. And " If any shareholder shall omit to make payment, pursuant to any call of the directors, for an instalment or instalments due on the stock standing in the name of such shareholder, or omit to fulfil any of the covenants and agreements of this contract, the shares held by such stockholder shall be forfeited to the use of

the association, together with all previous payments made thereon." Article 7th allowed the association to commence business, as soon as $100,000 of its capital was subscribed for and paid. After the end of six years, shareholders owning one-fourth of the *capital paid*, might annually designate one director who should retire, and an election should then ensue to fill the vacancy. (Article 8th.)

The defendant signed and sealed the Articles of Association, and annexed to the same was an agreement of the same date, which all the associates signed, including the defendant, and which is in these words:

" We, the undersigned, do hereby subscribe for and agree to take the number of shares set opposite to our respective names, as shareholders of The New York Banking Company, having paid an instalment on the same, at the time of subscribing, of five dollars on each share, and we do bind ourselves and assigns, to fulfil all the covenants and engagements contained in the Articles of Association." The defendant set twenty-five shares opposite to his name, upon this instrument.

The Articles of Association and agreement appended, were proved and recorded in pursuance of the act, and a copy was filed in the secretary's office; and the association commenced business as a banking company.

The defendant contends, that his obligation by his subscription, was merely to take the twenty-five shares, which he has done; that he incurred no personal liability to·pay for such shares; and that the only remedy which the association had, for his omission to pay the calls upon his stock, was to forfeit it to the use of the association, under the sixth Article.

I think this is altogether too restricted a view of the effect of his subscription for this stock.

The provisions of the General Banking Law, to which I have referred, demonstrate that the legislature had no intention to create banks without actual capital. For more than thirty years previous to the passage of that act, the business of banking had been a privileged pursuit in this state, variously guarded by penal laws, and its exercise conferred only by special acts of

legislation. By the general banking law, it was designed to throw the business open to the public, so far as to dispense with special charters ; but in no respect departing from the system of prescribing and defining its limits, and preventing frauds and abuses upon the community, which had so long been a marked feature in our legislation. Hence the various restrictions as to circulating notes, the capital stock, &c., which are contained in the act of 1838. No institution could organize under it, with a less capital than $100,000. The privileges conferred, and the prior course of legislation show, that this was intended to be *actual capital*, and not nominal ; a substantial reality, not a bubble. The exemption of stockholders from personal liability for the debts of the association, affords a further reason for the legislature's insisting upon a known and actual capital. The subsequent provisions confirm this view, so as to leave no room for a doubt. The certificate, which was to make known to the public the existence, sphere of operations, and resources of the bank, was to specify the amount of its capital stock, and the number of shares composing it, and by whom they were held. The capital stock might be increased from time to time, not by paying in upon the capital first subscribed and set forth in the certificate ; but by an addition to such original capital ; precisely as the Articles of the New York Banking Company prescribe. Then in the semi-annual statements which were to be filed with the comptroller, in order to keep the community informed of their progress and stability, each association was required to state the amount of its capital stock *paid in according to the provisions of the act, or secured to be paid.*

Now the act makes no provision in express terms, for the paying in of the capital. But the paying in or securing it, is a necessary consequence of the provisions, that the capital stock shall not be less than $100,000, and that the amount of it shall be determined upon and specified, in the certificate upon which it becomes organized.

The semi-annual statement is to show the amount of its losses, and to specify whether they have been charged on its *capital* or profits. Here again is evidence that the word capital, throughout, means not a name, but a thing ; not a nominal sum para-

ded to a credulous public, but a sum fixed by the organic arti-
cles, and actually paid or secured.

So of the 28th section of the act ; it does not admit of the pos-
sibility of a nominal capital.    It treats of a withdrawal from a
paid up capital, and designates the same as the *original capital.*

To test this proposition farther, I will suppose that the . New
York Banking company had set out with a capital of $100,000, in
shares of $100 each ; so subscribed and so stated in its articles
and filed certificate ; and the defendant had appeared, as he now
does, a subscriber for twenty-five shares.

I will also suppose that the shareholders had paid in propor-
tion, as they have in this case, and that the defendant had paid
in cash and dividends, fifty per cent. on the amount of his stock.
What kind of a return to the comptroller could this bank make ?
Could the president or cashier, make oath that its capital was
$100,000, paid in, *or secured to be paid ?* Assuredly not. Only
half is paid in ; and the other half is neither paid, or in any man-
ner secured, on the defendant's view of his subscription.

Would not the return show on its face, that the bank had no
legal existence, and that it was usurping the franchises intend-
ed to be granted by the act?

These brief considerations, which might be much extended,
and probably to the advantage of the argument, convince me that
the capital stock fixed by these associations, and specified in their
certificates, is an amount which the legislature required to be paid,
or secured to be paid, as the foundation of the operations which the
statute permitted to them. And that such payment or security, of
the known and designated capital, was a part of the declared policy
of the law, and was imperatively demanded for the public secu-
rity.    A different construction, would subject the community to
the evils of a horde of showy but irresponsible institutions, which
under the imposing title and provisions of this act, might swindle
the credulous and the unwary, without restraint or redress.

Such being the character and intent of the law, what did the
defendant undertake, when he subscribed these articles of associ-
ation?    He thereby declared to the public and his colleagues,
that he was one of a number of associates in this bank, that its
capital should be a million of dollars, and that he had subscribed

for and agreed to take twenty-five hundred dollars of such stock. He contracted, and made this declaration, in direct reference to the statute, and the statute itself thus became a part of his undertaking.

Is his agreement satisfied or fulfilled in any sense, by his simple signature to the articles and certificate? Is that a *taking of the shares*, within the meaning of the statute and articles.

It seems to me there can be no doubt upon these questions. When the defendant subscribed for and agreed to take this stock, he contracted to become a stockholder according to the banking law. He agreed to receive, and pay up or secure, $2500, of the capital stock of this company. It was this undertaking, that he put forth to his associates and to the community; and he could scarcely have imagined that his subscription imposed no personal liability, unless he was willing to lend his name to a scheme which was more likely to prove dishonest and fraudulent, than to promote any honest purpose.

His subscription imposed upon him, by force of the act, the duty of paying for his stock, or securing it to be paid, and the duty is recognized by the language of the sixth article. The law implies an obligation from this duty, upon which an action may be maintained. The articles it is true, in effect require that calls should be made by the directors, and probably the association could not maintain an action at law, until such calls were regularly made; but that does not impair the remedy in behalf of the receiver. The provision for the forfeiture of the shares does not affect this construction. If that were the only remedy, the statute which is paramount to the articles, would be evaded and infringed. The law requires payment or security, upon such a subscription, and forfeiture of stock, is not a compliance with its requisition. It might result in payment, but such a result is never probable. The subscribers would pay, if the stock were worth purchasing.

Nor is the "capital stock," in this bank, to be deemed only $100,000, within the meaning of that term in the banking law. The associates provided that they might commence business when $100,000, was paid in; but at the same time, they agreed

with each other, and declared to the world, that the capital stock should be a million.

I am by no means satisfied that I ought not to hold the defendant liable to pay the full amount of his shares, upon the terms of his written contract, without reference to the statute. To "subscribe for" shares, in one of the ordinary significations of the word, *subscribe*, is to promise to give the thing subscribed for, or to contribute to the undertaking accordingly. In this case, it would be equivalent to a promise to contribute $2500, towards the capital stock of the bank. So when he agreed *to take* twenty-five shares, what was this but an agreement to receive the shares, and get them into his possession, which could only be effected by paying for them. One who agrees *to take* a thing, which is the subject of price or compensation, *ex vi termini*, agrees to pay for such thing, the price attached, or what ever it is worth. But without resting upon the language of the defendant's subscription alone, my conclusion upon the articles, the subscription and the statute, is clear and unhesitating, that he was personally liable to pay the full amount of the capital stock which he subscribed.

It was insisted by the defendant, that the banking law, as well as the articles of Association, expressly exempted him from personal liability for the debts of the association. This is very true, but it does not apply to the case. This suit is brought to compel the defendant to pay his own debt *to* the association. It is not an attempt to subject him to the debts due from the company, any farther than it requires him to make good his subscription to the capital stock, on the faith of which the company acquired a corporate existence, and the power and credit to contract obligations.

I have thus considered the question upon principle, because the authorities in this state, were deemed by the defendant's counsel, inconclusive ; and I believe the point has not been expressly decided, either in this court or the court for the correction of errors.

I will next recur to those authorities. The first case is that of the *Union Turnpike Company* v. *Jenkins*, (1 Caines R. 381.) The subscription contained an express promise to pay, and one

contested question was, whether there was any consideration to support it. The court decided that the interest in the shares of stock acquired by subscribing, was a sufficient consideration to support the action. The charter required ten dollars on each share to be paid at the time of subscribing, and as it did not appear that the defendant had complied with this condition, Lewis, Chief Justice, dissented, on the ground that the defendant had not become a member of the company.

On the latter ground, the judgment was reversed in the court for the correction of errors, 1 Caines C. in E. 86. One senator pronounced an opinion for reversal, for this and the further reason that the charter authorized the company to forfeit the stock for non-payment of the calls. But the chancellor held the latter to be a cumulative remedy, and the decision has always been regarded by the courts, as proceeding on the other ground exclusively. (See *Goshen Turnpike Company* v. *Hurtin*, 9 Johns. 217, per Curiam; *Dutchess Cotton Manufactory* v. *Davis*, 14 Johns. 244, per Thompson, Ch. J.)

It is difficult to perceive wherein an express promise in these subscriptions, enhances the liability. The consideration which is requisite to sustain such a promise, is raised by inference of law, from the subscription itself and the privileges thereby conferred. From the same circumstances, will not the law infer a duty to pay for the stock, and an implied obligation of equal validity with an express promise? I think it will, in the usual forms of subscription, where there is nothing in the charter repugnant to such an inference; and many of the adjudications appear to sustain this principle.

In the *Goshen Turnpike* case, above cited, the decision was that an action lies against a stockholder, on a note given for shares, payable in instalments as the corporation should require. The court say that an action would lie for the instalments, on a subscription for the stock, promising to pay the amount.

In the *Highland Turnpike Company* v. *McKean*, (11 Johns. 98,) and the *Dutchess Cotton Manufactory* v. *Davis*, (14 ibid. 238,) the actions were maintained on the subscription, containing an express promise to pay.

*The Harlaem Canal Company* v. *Seixas*, and v. *Spear*, (2

Hall's Rep. 504, 510,) in the New York Superior Court, are to the same effect. The cases were upon demurrer, and the promise averred in the declaration, might therefore be assumed to be express. In *Spear v. Crawford*, (14 Wend. 20,) which was an action against a stockholder of the Harlaem Canal Company, at the suit of a creditor, the defendant had done no act whatever as a stockholder, except to sign a paper, by which he agreed *to take* sixteen shares of the capital stock of the company ; and the court held him to be liable. Judge Sutherland, delivering the judgment of the court says, " The promise of the defendant and the other subscribers, although it is . in form, to take the shares subscribed by them respectively, is undoubtedly, (when taken in connection with what precedes it, and with the act of incorporation, which is there referred to and in part recited,) a promise not only to take the shares, but to pay for them, to take them upon the terms and conditions set forth in the subscription paper ; and the corporation could, undoubtedly, in the appropriate form of action, and upon a declaration containing the necessary averments, have enforced payment of the subscription price of the shares, from the subscribers." In *The Herkimer Manufacturing and Hydraulic Company* v. *Small*, (21 Wend. 273,) and again before the supreme court in 2 Hill's R. 127, the court assume it to be the settled law, that a stockholder is liable by force of his mere subscription for the stock, without an express promise.

In *The Troy Turnpike and Rail Road Company* v. *McChesney*, (21 Wend. 296,) the promise of the subscribers to the stock was express, but it was to pay in the manner specified, *upon pain of forfeiting to the company all previous payments made thereon.*" The court decided that the company could recover on this subscription, and that it might be counted upon as an absolute promise.

These authorities go far to show that the settled . law of this state is, that one who subscribes for shares, or agrees to take shares, in an incorporated company, thereby becomes liable to pay the amount of such shares to the company.

On another point presented in this case, they are perfectly decisive, viz. that the authority to forfeit the stock for the non payment of instalments, does not take away or impair the right of action against the stockholder upon his subscription, and that

the remedy by forfeiture is cumulative. This was held in 1 Caines R. 381, and in several of the subsequent cases which I have cited. The Herkimer Manufacturing Company case, (21 Wend. 273,) went farther, and decided that an actual forfeiture of the shares did not preclude an action for the sum payable thereon, unless the value of the forfeited shares was equal to such sum. If the value were less, the company was entitled to recover the difference.

This subject has been much discussed in the courts of the different states. In Massachusetts, it is held that a subscriber is not liable upon his subscription for stock, unless he expressly agrees to pay. See the cases collected in Angell and Ames on Corporations, 419 to 426, 2d Ed.

In the *Worcester Turnpike Corporation* v. *Willard*, (5 Mass. 80,) the court nevertheless enforced an express promise to pay assessments on the shares, although there was a clause of forfeiture superadded. Similar in principle is the *Bear Camp River Company* v. *Woodman*, (2 Greenleaf, 404.)

The courts in New Hampshire and Maine, appear to have adopted the rule as established in Massachusetts.

In Vermont, it is held that an action of assumpsit, may be maintained upon the subscription, without an express promise, where the charter or by-laws provide no other remedy for the recovery of assessments. (*Essex Bridge Company* v. *Tuttle*, 2 Vermont R. 393.)

In the case of *Instone* v. *The Frankfort Bridge Company*, (2 Bibb, 576,) the action was assumpsit against a stockholder, counting upon a subscription for twenty shares, and a call by the directors. There was no express promise or provision for payment. The court of appeals in Kentucky, sustained the action, on the grounds which I have attempted to illustrate in this suit.

In that case, the charter contained a clause authorizing the directors to forfeit the stock for non-payment, and the directors had proceeded to order a sale of the defendant's shares, and had advertised them and offered them accordingly. Two shares were sold, and they could obtain no bid for the others. The court held that the forfeiture was a cumulative remedy, and did not interfere with the one by action.

The principle upon which this bill is maintained, was decided in *Dugan* v. *The Mayor &c. of Baltimore*, (1 Gill & Johns. 499.) The charter of the city of Baltimore authorized the laying of taxes, and the collection of the same by distress. It was adjudged that the corporation could maintain an action of assumpsit for a tax regularly imposed. In the previous case of *The Mayor &c. of Baltimore* v. *Howard*, (6 Harr. & Johns. 383, 394,) the same ground was taken by the court, but the decision was on another point, viz., that where a distress or action was authorized for the recovery of a tax, they were cumulative remedies. In *Bend* v. *The Susquehanna Bridge and Banking Company*, (6 Harr. & J. 128,) an action was maintained for instalments called on the stock, against the assignee of shares from an original subscriber. The court say that a subscription for the stock, or the taking a transfer, raises an assumpsit to pay all calls regularly made.

But the case which from its intrinsic merit and unanswerable argument, outweighs all the others, was decided in 1838, by the supreme court of errors in Connecticut, and it is precisely in point. I refer to the *Hartford and New Haven Rail Road Company* v. *Kennedy*, (12 Conn. R. 499.) The action was assumpsit to recover the assessments on ten shares of stock which Kennedy had subscribed for in that company. The subscription contained no promise. Its operative words were, " we do hereby subcribe to the stock of the said rail-road, the number of shares annexed our names respectively on the terms, conditions and limitations mentioned in the said resolution," (incorporating the company.) The 13th section of the charter provided that the directors might require payment of the sums subscribed to the capital stock, as they might deem fit, and in case any stockholder should refuse or neglect to make payment, his stock might be sold by the directors, after six months from the time when the payment became due. The court decided that from the relation of stockholder and company created by the charter and the subscription, a promise by the defendant, was implied to pay the instalments on the shares ; and that the remedy given by a sale of the stock of delinquent shareholders, was cumulative merely, and left such promise in full force. The opinion of the court was delivered by

Mr. Justice Huntington, with an ability and cogency of reasoning which has excited my highest admiration, and which it would be vain for me to attempt to imitate. It is in my judgment, unanswerable upon the great question involved, the force and effect of a subscription for shares in these stock corporations; and it is reposed upon the solid foundations of the end and design of the legislature, and the sense and meaning of the act of subscription.

The learned counsel for the defendant, argued that the rail road case differs from this, in the fact that there was an express authority in the charter, *to require payment* of the stock, while here no such power is given. This is true as to an express power, for the general banking law contains none. But it of necessity confers on every association organized under it, the power to call in its capital stock, either by its directors or by such other officers as the persons associating may designate. This power is essential to the existence of the association as a legal entity.

In several of the Massachusetts cases, the charters and statutes confer an express authority to require the payment of the stock by instalments, but this was never held to render subscribers liable. In 12 Conn. R. 530, (*The Hartford R. R. Co.* v. *Boorman*,) on the same charter before stated, a stockholder who derived his stock by a transfer from an original subscriber, and received a certificate from the company, was held liable to pay the instalments subsequently called for, in an action of assumpsit.

These decisions in Connecticut, although they are not authority here, command my entire assent and concurrence.

*The Society for the Illustration of Practical Knowledge* v. *Abbott*, (2 Beavan, 559,) is analogous in principle. There, four projectors of a public company, obtained a charter, by which they and all persons who might become subscribers, were incorporated. The capital was declared to be £20,000, which was to be divided into 400 shares. The four projectors advanced and expended in the prosecution of their enterprise, about £8000, and before any other subscribers joined, they divided the 400 shares among themselves, agreed to call their investment £16,000, and the balance, £4000, they paid to the corporation. After this,

Sagory v. Dubois.

they disposed of a large number of the shares. On the facts becoming known to the new shareholders, a bill was filed by the corporation against the four projectors, to compel them to pay up the full consideration of £20,000, for the shares they had originally taken. Lord Langdale, Master of the Rolls, sustained the bill, and held that it was not competent for them to take the shares without paying the full consideration, although at the time they were the only persons interested in the company.

The authorities to which I have referred, with the few exceptions stated, concur in maintaining the principle upon which I deemed the defendant liable to pay for his shares of stock, and are decisive by their weight and character.

The defendant being liable by force of his subscription for the stock, the resolution of the directors in September, 1841, not to make any further calls upon the shares, was unavailing to discharge his obligation in respect of the association and its creditors. (See *Mangles* v. *The Grand Collier Dock Company*, 2 Railw. Cas. 359, & 10 Sim. 519.) A subsequent board might have rescinded the resolution, and a receiver acting for creditors must disregard it.

Another question of moment arises in respect of the dividends declared, and which were so arranged as to be cotemporary with the payments of three of the instalments called in on the capital stock, and were applied to the discharge of such instalments.

The 28th section of the general banking law, prohibits dividends by withdrawing the capital stock, or out of profits while the paid up capital is deficient, so long as there are any debts owing by the association. And the law relative to monied corporations, (1 Rev. Stat. 589, § 1,) makes it unlawful for such corporations to make dividends, except from their surplus profits.

The defendant was an active director of the New York Banking Company, and must be deemed chargeable with knowledge of the state of its affairs. According to the statutes, which I have just cited, his right to receive and apply the dividends in question, depends on the state of the institution, and the existence of surplus profits.

There is some doubt upon the testimony, whether the two first dividends did not exceed the profits actually earned when they

were paid, but the point is not so clear as to authorize me to say that any part of those dividends was made by a withdrawal of the capital.

In regard to the third dividend, payable Nov. 1, 1840, it is clear to my mind that it ought not to have been made. The Hernando Rail Road and Banking Company, had failed long before that period, to meet its engagements with the New York Banking Company, and the balance against it on the books of the latter company, was at that time more than $112,000. The failure of the Hernando Company, had been communicated to the board of directors of the New York Banking Company, in April, 1840, and again on the 19th of October, 1840, when the dividend was declared. I have no doubt but that the directors *believed* what the president hoped, that there would be no ultimate loss from this debt, and that they declared the dividend in good faith; but I think it was improvident and improper, to divide their apparent surplus, when nearly a third part of their whole capital was locked up in a suspended debt of an uncertain, if not doubtful character. In support of this opinion, I refer to the chancellor's observations in *De Peyster* v. *The American Insurance Company*, (6 Paige, 486;) and *Scott* v. *The Eagle Fire Company*, (7 ibid. 198.)

The consequence is, that the credit which the defendant received upon his capital stock for the amount of the third dividend, is not to be regarded as a payment of such amount, and the same is still due and payable upon his subscription.

In regard to interest upon the unpaid balance of the defendant's stock, the rule at law appears to be, that the shareholder is liable for interest on the sums called in on his stock, from the times when the calls are payable respectively. By analogy to this rule, it will be proper to charge the defendant with interest from the day fixed in the receiver's advertisement under the statute, for the debtors of the association to make payment, which was the 15th of January, 1844.

As to costs, I have with some hesitation concluded that the defendant should not be charged with the complainant's costs, and they must be borne by the fund. This is a pioneer suit, presenting a question of great importance, and which was an open question in this court. The defendant has made the litigation

more burthensome than was necessary, but on the other hand the complainant claimed more against him than he was entitled to recover.

The decree will direct the defendant to pay to the receiver the unpaid balance of his twenty-five shares of stock, without any credit for the third dividend, and with interest from January 15, 1844. The amount can be ascertained and inserted in the decree, without going into the master's office.